**AFFIRM; and Opinion Filed February 20, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-01178-CV

### IN RE: THE COMMITMENT OF JOHNNY DOYLE BROWN

**On Appeal from the 86th Judicial District Court**
**Kaufman County, Texas**
**Trial Court Cause No. 94099-86**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Fillmore, and Stoddart
Opinion by Justice Fillmore

In this civil commitment proceeding, the State of Texas petitioned to have Johnny Doyle Brown declared a sexually violent predator (SVP) under the Civil Commitment of Sexually Violent Predators Act (the Act). *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.151 (West 2017). After the jury found beyond a reasonable doubt that Brown is an SVP, the trial court rendered judgment on the jury's verdict, and ordered that Brown be civilly committed for sex offender treatment and supervision. In three issues, Brown contends the evidence is legally and factually insufficient to support a finding he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence, and the trial court erred by admitting evidence of an unadjudicated sexual offense and of Brown's "rape fantasies." We affirm the trial court's judgment.

**Background**

In November 2015, the State filed a petition alleging that Brown is an SVP, and requested he be committed for treatment and supervision. In the presence of the jury, the State read into the record Brown's responses to the State's request for admissions, which included admissions he had pleaded guilty to two offenses of sexual assault; the indictment for the second offense alleged the victim was under the age of seventeen; the victim of the second assault was A.H.; A.H. was a stranger to him; he believed A.H. initiated sexual contact with him; he had received "disciplinaries" in prison for attempting to establish an inappropriate relationship with staff; he knew it was wrong to sexually offend against his victims, but did it anyway; he was a recovering alcoholic, but did not believe he had a problem with alcohol abuse; he had used marijuana, "acid," "speed," powder and crack cocaine, and heroin, but did not believe he had a problem with drug abuse; and he did not believe he needed substance abuse treatment.

Brown testified that, at the time of trial, he was serving a fifteen-year prison sentence for sexual assault, and he had previously been incarcerated for the sexual assault of L.M.[1] As to the first conviction, Brown testified he met L.M. in early May 1995 at the tire shop where he was employed. L.M. returned to the tire shop on May 17, 1995, left her two children in the car, and came into the shop. Brown, who was under the influence of marijuana, shut and locked the door to the shop. L.M. expressed concern at Brown's actions because her two children were in the car. Brown told L.M. to watch her children through the window and began kissing her. He pulled down L.M.'s shorts and panties and his own pants. Although L.M. told Brown to stop, he did not do so; rather, he pushed L.M. against the tire rack and stuck his finger into her vagina. Brown denied at trial that he attempted to penetrate L.M.'s vagina with his penis, but admitted he had

---

[1] Much of Brown's testimony about the two offenses was in response to leading questions from the State. However, based on records he had reviewed, Dr. Steven Thorne also discussed the details of the offenses. Dr. Thorne's testimony was consistent with that given by Brown.

testified during his deposition that he tried multiple times to penetrate L.M.'s vagina with his penis. At the time he committed the offense, Brown was romantically involved with a woman he later married.

Brown recalled being interviewed by Dr. Steven Thorne about the offense, but did not remember what he said during that interview. He did not deny, however, that he told Dr. Thorne that L.M. wanted to buy drugs from him. He also did not deny he told Dr. Thorne that L.M. grabbed his crotch and told him she wanted to have sex with him, but he refused her advances.

Brown pleaded guilty to sexually assaulting L.M., and was placed on community supervision for a period of five years. Brown did not successfully complete the probation, and his community supervision was revoked for not paying the required fines, completing community service, or attending counseling sessions. Brown testified he participated in sex offender treatment, but "didn't learn nothing." He admitted, however, that records indicated he was terminated from the treatment program for failing to attend nine sessions. On March 4, 1997, Brown was sentenced to two years' imprisonment.

While he was incarcerated, Brown participated in the Changes program, which he believed helped him. Brown stated he learned how "to keep his pants zipped up," watch how he approached people, pay attention to his surroundings, and always have an alibi. Brown was released from prison in December 1998.

On July 5, 2002, after using heroin, cocaine, and "acid" and drinking whiskey, Brown went to A.H.'s house and asked if he could mow the grass. Brown ran out of string for the weed eater, and asked A.H.'s mother to buy him some more. He told A.H.'s mother he was leaving to check on another job. However, rather than leaving the house when A.H.'s mother left, he went into the house and found A.H., who was then fourteen-years-old, in the restroom. Although Brown denied at trial that he walked up behind A.H. and pulled down her shorts and panties, he admitted that,

during his deposition, he testified he removed A.H.s shorts and panties. A.H. tried to resist Brown, but he pulled his pants down. Brown denied at trial that he forced his penis into A.H.'s vagina, but admitted he had testified during his deposition that he had done so. Brown was married at the time he committed the offense. Brown pleaded guilty to sexually assaulting A.H., and was sentenced to fifteen years' imprisonment on October 30, 2002.

Brown was interviewed about the offense by Dr. Thorne and Dr. Marisa Mauro. Brown testified he did not remember telling Dr. Thorne and Dr. Mauro that A.H. tried to seduce him. He admitted, however, that during his deposition and in a sex offender education program, he stated with regard to the offense that "it takes two to tango." Brown admitted that, when he was deposed approximately five months before trial, he believed A.H. "came onto to him," but had since realized A.H. had not done so.

During his second incarceration, Brown requested to participate in an anger management class, but was dropped from the class due to his failure to attend. He completed a Cognitive Intervention class in 2010, in which he learned that his actions were responsible for him being in prison. Brown testified he was ashamed of his crimes.

Brown was circumcised in prison in 2005. He testified that, following the procedure, his "sex drive went away," and it had been years since he thought about sex. Regardless, he requested in 2009 to be castrated, but ultimately decided not to pursue castration. Brown admitted he received "disciplinaries" in prison for breaking the rules, two of which were received in 2013 for attempting to establish an inappropriate relationship with a correctional officer. Although Brown admitted he continued to make inappropriate comments to the officer after being told not to do so, he denied saying to the officer that he "wanted to grab a handful of her ass," and did not recall telling the officer she "needed a man to take care of her."

According to Brown, he was arrested for the first time when he was twelve years' old and, in total, had been arrested approximately twenty times in his life. The offenses for which he had been arrested included theft, burglary of a building, assault of his brother, providing alcohol to a minor, and public intoxication.

Brown began drinking alcohol and using marijuana when he was twelve years' old, and began using cocaine, "acid," and "speed" when he was fifteen years' old. He used all these substances until he was incarcerated for the first time. Although he did not use drugs or alcohol during his first incarceration, he began using these substances again after he was released. Brown had not used drugs or alcohol during his second incarceration, but was willing to participate in drug and alcohol treatment. Brown believed that, if he had been sober, he would not have committed the offenses against L.M. and A.H.

Brown testified he began having "rape fantasies" when he was eighteen or twenty-one years' old. He also admitted he was investigated in 1988 for committing a sexual offense against a three-year-old boy. Brown initially denied touching the boy, and stated he was never charged with an offense. However, he then admitted he pulled the boy's penis so hard there were abrasions on it, and that his actions probably affected the boy "very bad." Brown confirmed he was also investigated for sexually abusing his stepson, but denied any abuse had occurred.

According to Brown, he was taking responsibility for what he had done wrong. Further, he believed he had changed and was not a risk to reoffend. After he was released from prison, he intended to control his sexual urges by going to work, keeping to himself, hanging around positive people, and not having friends who were negative. He testified he had victimized "two people so far," and was confused when he previously testified he had four victims.

Brown was evaluated by both Dr. Thorne, who was retained by the State, and Dr. Mauro, who was retained by Brown. Both experts are licensed psychologists who specialize in forensic

psychology and have extensive experience in evaluating individuals for a behavioral abnormality under the Act. Dr. Thorne has performed evaluations at the request of both the State and defendants, while Dr. Mauro has performed evaluations exclusively for defendants.

Dr. Thorne and Dr. Mauro both used a clinically-adjusted actuarial approach in their evaluation of Brown. This methodology is in accordance with accepted standards in forensic psychology, and is followed by other experts who do these types of evaluations. The evaluation involves reviewing available records relating to Brown and interviewing Brown, and using that information to look for certain traits or characteristics that research has shown might increase or decrease Brown's risk for future sexual violence.

Both Dr. Thorne and Dr. Mauro agreed Brown had low intellectual functioning. Dr. Thorne believed that Brown understood all the questions asked during their interview, but conceded Brown did not always answer the questions consistently and did not testify consistently at trial. According to Dr. Thorne, it was possible Brown was inconsistent because he was not being truthful and, due to his mental capacity, was unable "to remain firm on a decision."

Dr. Mauro, however, believed Brown had difficulty understanding the questions asked during their interview. She attributed this difficulty to Brown's low intellectual ability and verbal comprehension problems. Brown gave contradictory information during the interview, and did not seem to appreciate that he was providing contradictory information. Dr. Mauro, therefore, believed the written records about the underlying offenses and the 1988 unadjudicated offense were more reliable than Brown's statements regarding the offenses

Dr. Thorne and Dr. Mauro relied on the Diagnostic and Statistical Manual (DSM) for mental disorders in evaluating Brown. They both utilized the Static-99R, a list of ten risk factors used to score whether someone has a behavioral abnormality, and the Psychopathy Checklist

Revised (PCLR), which is an assessment of whether the individual meets criteria as a psychopath. Dr. Mauro also completed the Static-2002R, an update of the Static-99R.

Dr. Thorne scored Brown a twenty-four on the PCLR, which placed Brown on the "high end of the moderate range." In Dr. Thorne's opinion, Brown was not a psychopath, but had some characteristics indicative of psychopathy, including impulsive behavior, lack of remorse, lack of empathy, a history of rule violations, a history of sexual deviancy, legal problems as a juvenile, failure to take responsibility for his actions, and manipulative behavior. Dr. Mauro scored Brown a nineteen on the PCLR, which is within the range designated as not psychopathic. She agreed, however, that Brown exhibited several psychopathic traits.

The Static-99R organizes some of the traits that can constitute risk factors for an individual to reoffend. An individual's total score on the Static-99R is compared to other individuals in either the "routine group" or the "high risk group" who had a similar score and are known to have sexually reoffended within a certain period of time. Dr. Thorne and Dr. Mauro agreed that, because sexual offenses are underreported, the Static-99R underestimates the percentage of individuals who have reoffended. Dr. Thorne and Dr. Mauro also agreed the score on the Static-99R must be evaluated in combination with other identified risk factors.

Dr. Thorne scored Brown a three on the Static-99R, placing him in the low to moderate range for risk of reoffending. According to Dr. Thorne, between 7.0 and 8.8 percent of the individuals in the routine group with a score of three were known to have reoffended within five years. For individuals with a score of three in the high risk group, between 11.3 and 17.2 percent were known to have reoffended within five years, and between 18.2 and 28.5 percent were known to have reoffended within ten years.[2] Using local norms, 4.2 percent of individuals in Texas with a score of three were known to have reoffended with five years.

---

[2] Dr. Thorne did not express an opinion on whether Brown should be compared to the routine group or the high risk group.

According to Dr. Thorne, the two big risk factors for reoffending are sexual deviancy and antisocial behavior. Dr. Thorne defined "sexual deviance" as engaging in some type of sexual acts or having some types of sexual thoughts that are harmful to oneself or to others, may violate the rights of others, or may be inappropriate due to an age difference. Brown's offenses against L.M. and A.H. are considered by Dr. Thorne to be sexually deviant. Further, the notations in Brown's records and Brown's testimony at trial about his "rape fantasies" indicated sexual deviancy, and in Dr. Thorne's opinion, it was significant that Brown had acted on that fantasy.

Dr. Thorne testified the details of an offense are important when assessing the issue of behavioral abnormality because research has shown some traits of sexual offenses increase an individual's risk for future sexual violence. An individual who chooses victims from outside his family or who are strangers has a greater risk of reoffending than an individual who had incestual victims. Further, a person who is attracted to children or individuals who are much younger than him, or who has assaulted a young, male victim, has a higher risk to reoffend. If the sexual offenses are linked to drug and alcohol use, it is a risk factor if the individual continues to use those substances. It is also a significant risk factor if an individual has assaulted a victim, is punished, and then assaulted another victim after punishment, as opposed to having assaulted two victims prior to being punished. Other risk factors for reoffending include whether the individual fails to complete probation or sex offender treatment, or has an unstable lifestyle.

Dr. Thorne explained to the jury how the identified risk factors applied to Brown. Dr. Thorne first recognized that L.M. was a victim outside Brown's family. Brown did not successfully complete his community supervision for that offense, including failing to complete sex offender treatment. After he was punished for sexually assaulting L.M., Brown reoffended by sexually assaulting A.H., who was both a stranger and a child victim. Further, although Brown denied in his interview that he fondled a three-year-old boy in 1988, Dr. Thorne heard Brown acknowledge

at trial that he was "sexually inappropriate" with the child. Dr. Thorne also pointed to the "disciplinaries" Brown received in prison for making inappropriate comments to a correctional officer. In Dr. Thorne's opinion, these comments demonstrated both ongoing sexual deviance and lack of impulse control by Brown. Further, if Brown were to use drugs or alcohol in the future, it would increase his risk of reoffending.

As to Brown's antisocial orientation, Dr. Thorne defined antisocial acts as criminal acts or acts that violate the rights of others. In Dr. Thorne's opinion, Brown demonstrated an antisocial orientation by assaulting L.M. at a location where her children could see the assault, failing to comply with the terms of his community supervision, being arrested over twenty times during his life, using illegal substances, and incurring rule violations in prison. Further, Brown has had an unstable lifestyle since youth, and even though he was romantically involved at the time of both offenses, that support did not prevent him from committing either offense. Upon his release from prison, Brown would not have any type of social support system to prevent him from reoffending.

Dr. Thorne testified that Brown had displayed significant antisocial behavior as an adult. However, he did not have sufficient information about Brown's behavior before the age of fifteen to allow him to diagnosis Brown with antisocial personality disorder. Instead, Dr. Thorne diagnosed Brown with "other specified personality disorder." Dr. Thorne did not diagnose Brown with a sexual disorder under the DSM, such as paraphilia or pedophilia, but gave Brown a "V Code" for adult sexual abuse and child sexual abuse. Dr. Thorne testified a V Code is a condition in the DSM that indicates an issue that should be considered in the treatment of the individual, and he used a V Code because a diagnosis of paraphilia under the DSM does not include sexual assault of an adult.

Dr. Thorne also considered certain protective or mitigating factors that could reduce Brown's likelihood of reoffending. At the time he evaluated Brown, Dr. Thorne believed the fact

Brown had not had a male victim was a mitigating factor. However, based on Brown's testimony at trial that he had fondled a three-year-old boy, that mitigating factor might no longer be applicable. In Dr. Thorne's opinion, the fact Brown did not have schizophrenia or psychosis could be a mitigating factor. Dr. Thorne also noted that generally people who complete sex offender treatment have a lower risk of offending, but he was aware of no research to support a conclusion that the Cognitive Intervention class Brown completed in prison reduced his risk for reoffending.

According to Dr. Thorne, all the relevant factors have to be viewed in combination, and he could not predict whether Brown would actually reoffend. However, based on the risk factors, it was his opinion Brown had a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

Due to the inconsistencies in Brown's interviews, Dr. Mauro relied more on Brown's records in completing the evaluation. Dr. Mauro scored Brown a two on the Static-99R. According to Dr. Mauro, most sex offenders receive this score and are designated as a "low moderate" risk for reoffending. Between 4.8 and 6.5 percent of individuals with a score of two are known to have reoffended within five years. Looking at local norms, approximately 1.8 percent of individuals in Texas with a score of two are known to have reoffended within five years. Dr. Mauro also scored Brown using the Static-2002R, which is weighted differently from the Static-99R. Brown scored a five on the Static-2002R, which is in the moderate range. Between 12.2 and 15.6 percent of individuals who scored a five on the Static-2002R are known to reoffend within five years. Based on this score, Brown's risk of reoffending is higher than that of the typical sex offender.

Dr. Mauro testified that Brown's failure to take responsibility for his actions, denial of his conduct, and poor insight were not risk factors that he would reoffend. Further, although she agreed Brown could be at risk for reoffending if he resumed using drugs or alcohol, Dr. Mauro did

not believe this was a major risk factor for Brown. Dr. Mauro also agreed that having a male victim was a risk factor for reoffending, but discounted Brown's testimony about the 1988 unadjudicated offense. Rather, she believed the best evidence relating to that offense was that no criminal charges were filed after the investigation was completed. Dr. Mauro also discounted as unreliable the notation in Brown's records about having "rape fantasies," and noted Brown did not rape L.M.

Dr. Mauro also considered Brown's institutional adjustment in her evaluation because it was the most recent record of his behavior. She noted Brown had received twelve or thirteen "disciplinaries" in prison, which she did not view as an excessive amount. Due to the many inconsistences in Brown's statements over time, Dr. Mauro discounted his admission that he had made inappropriate sexual comments to a correctional officer. She believed that, while Brown had behaved impulsively in the past, his conduct had improved as he had become older.

According to Dr. Mauro, the DSM allows for a categorical identification of mental illness. However, a diagnosis of mental illness does not mean a person has a behavioral abnormality and not all conditions are associated with reoffending. Dr. Mauro considered diagnosing Brown with borderline intellectual functioning, a condition that is not included in the current DSM. In her opinion, this condition would not constitute a behavioral abnormality under the Act. Dr. Mauro testified the Act does not require Brown to be diagnosed with any kind of paraphilia in order for him to have a behavioral abnormality. However, she did not believe that either Dr. Thorne's diagnosis of other specified personality disorder or the V Codes assigned by Dr. Thorne to Brown could be a condition that causes a behavioral abnormality. Rather, the DSM states V Codes are not to be considered a mental disorder and, in her opinion, V Codes are used only to provide another clinician with information about what is happening in the patient's life and for insurance or billing purposes.

Dr. Mauro recognized that past behavior is one predictor of future behavior, and that it was impossible to predict with one hundred percent certainty that Brown would not reoffend. However, based on Brown's "low statics score," the absences of any mental health conditions, the time period during which he had not abused drugs or alcohol, and his institutional adjustment, she was certain that Brown was a low risk for reoffending. In Dr. Mauro's opinion, Brown is a typical sex offender, does not fall into that "small but dangerous" group of sex offenders the Act intended to address, and did not have a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

## Admission of Evidence

In his second issue, Brown contends the trial court erred by admitting evidence of the 1988 unadjudicated offense and the notation in Brown's records about his "rape fantasies."

### *Standard of Review*

We review a trial court's evidentiary rulings for abuse of discretion. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *In re Commitment of Colantuono*, No. 04-16-00801-CV, 2017 WL 5162624, at *8 (Tex. App.—San Antonio Nov. 8, 2017, no pet.). A trial court abuses its discretion when it acts without regard to guiding rules or principles. *U-Haul Int'l, Inc.*, 380 S.W.3d at 132; *see also Colantuono*, 2017 WL 5162624, at *8.

### *Rape Fantasy*

Brown complains the notation in his records about his "rape fantasies" was hearsay, and the trial court erred by allowing Dr. Thorne to testify about the notation. Generally, to preserve a complaint for appellate review, the complaining party is required to present the complaint to the trial court in a timely request, objection, or motion. *See* TEX. R. APP. P. 33.1(a). Brown did not object in the trial court that Dr. Thorne's testimony about the notation in Brown's record was hearsay and, therefore, failed to preserve this complaint for our review. *See id.*; *In re Commitment*

*of Hood*, No. 09-16-00012-CV, 2016 WL 4247961, at \*4 (Tex. App.—Beaumont Aug. 11, 2016, no pet.) (mem. op.).[3]

*Unadjudicated Offense*

Brown also complains the trial court erred by overruling his objection to questions about an unadjudicated offense. Brown testified he was investigated in 1988 for committing a sexual offense against a three-year-old boy, but was never charged with a criminal offense. He admitted he went into a restroom with the boy and the boy's brother, but stated he "didn't touch that little boy. That was a no bill." The State then asked, "It was a no bill, but you did, in fact, fondle his penis." Brown denied that he touched the boy. The State then asked Brown whether he pulled the boy's penis so hard that he left abrasions. Brown's counsel objected "[t]hese aren't facts that are in the record." The State responded, "these are facts that are within the evidence of this case." The trial court overruled the objection, and Brown responded "yes." Brown subsequently agreed he testified during his deposition that the little boy was the "first boy" he touched sexually.

Brown argues the trial court erred by allowing the State to cross-examine him about the 1988 unadjudicated offense without first reliably establishing the facts in the record.[4] We interpret Brown's objection to be that the State failed to lay the proper predicate before questioning Brown about the 1988 unadjudicated conduct. *See e.g.*, *McInnes v. Yamaha Motor Corp., U.S.A.*, 673 S.W.2d 185, 187 (Tex. 1984). As a person with personal knowledge of the investigation and any conduct that led up to it, Brown could lay the proper predicate for evidence about the investigation.

---

[3] Brown also testified, without objection, that he began fantasizing about raping someone when he was eighteen or twenty-one years' old. Accordingly, any error by the trial court in allowing Dr. Thorne to testify about the notation in Brown's records is harmless. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) (error is deemed harmless and is waived if same or similar evidence is introduced elsewhere without objection); *see also State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (any error in admission of evidence is likely harmless if it is cumulative of other evidence).

[4] Citing to Texas Rules of Evidence 404, 405, 607, 608, and 609, Brown also argues on appeal that, if a defendant in a criminal case takes the stand and denies committing an extraneous offense, the State is not permitted to cross-examine the defendant about the conduct without offering other evidence the conduct occurred. Brown did not make this argument in the trial court and, therefore, failed to preserve it for our review. *See* TEX. R. APP. P. 33.1(a); *In re Commitment of Lucero*, No. 09-14-00157-CV, 2015 WL 474604, at \*4 (Tex. App.—Beaumont Feb. 5, 2015, pet. denied) (mem. op.) ("An issue on appeal that does not comport with an objection made at trial is waived.").

–13–

*See* TEX. R. EVID. 602. Brown's personal knowledge could be shown through his own testimony. *See id.* Because Brown had personal knowledge of the 1988 investigation, and any underlying conduct that led to it, he could properly be questioned about that conduct. *See id.* Accordingly, the trial court did not err by overruling Brown's objection and allowing the State to question Brown about any conduct related to the 1988 investigation.[5]

We resolve Brown's second issue against him.

## Sufficiency of the Evidence

In his first and third issues, Brown asserts the evidence is legally and factually insufficient to support the jury's finding he is an SVP.

### *Applicable Law*

In enacting the Act, the Texas Legislature made specific findings that public safety and treatment are the primary statutory goals for the "small but extremely dangerous group of sexually violent predators . . . [who] have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes [them] likely to engage in repeated predatory acts of sexual violence." TEX. HEALTH & SAFETY CODE ANN. § 841.001; *see also In re Commitment of Mares*, 521 S.W.3d 64, 66 (Tex. App.—San Antonio 2017, pet. denied). To warrant an individual's commitment as an SVP, the State is required to prove beyond a reasonable doubt that the person (1) is a "repeat sexually violent offender," and (2) suffers from "a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* §§ 841.003(a), 841.062(a); *see also id.* § 841.002(8) (defining "sexually violent offense" to include, among other things, offense of sexual assault as defined in section 22.011 of penal code). A person is a repeat sexually violent offender if he has been convicted of more than one sexually

---

[5] Further, Dr. Thorne testified, without objection, that Brown admitted during his testimony that he fondled the boy. Accordingly, any error by the trial court in overruling the objection was harmless. *See Ramierz*, 159 S.W.3d at 907; *see also Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870.

violent offense and a sentence was imposed for at least one of the offenses. *Id.* § 841.003(b). A behavioral abnormality is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). A "predatory act" is one that is directed toward individuals for the primary purpose of victimization. *Id.* § 841.002(5).

*Standard of Review*

Because the Act requires the State to prove beyond a reasonable doubt that a person is an SVP, we review the legal sufficiency of the evidence using the appellate standard of review for criminal cases. *In re Commitment of Rogers*, No. 05-17-00010-CV, 2018 WL 360047, at *5 (Tex. App.—Dallas Jan. 11, 2018, no pet. h.) (mem. op.); *In re Commitment of Dever*, 521 S.W.3d 84, 86 (Tex. App.—Fort Worth 2017, no pet.). We assess the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the elements required for commitment under the Act beyond a reasonable doubt. *Rogers*, 2018 WL 360047, at *5; *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "It is the fact finder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts." *In re Commitment of Williams*, No. 01-16-00745-CV, 2017 WL 5892389, at *5 (Tex. App.—Houston [1st Dist.] Nov. 30, 2017, no pet. h.) (quoting *In re Commitment of Stuteville*, 463 S.W.3d 543, 551 (Tex. App.—Houston [1st Dist.] 2015, pet. denied)).

Although factual sufficiency has been abandoned in criminal cases, *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.), as an intermediate appellate court with final authority over factual sufficiency challenges in civil cases, we will perform a factual sufficiency review in cases under the Act when the issue is raised on appeal. *Rogers*, 2018 WL 360047, at *5 & n.2; *Dever*, 521 S.W.3d at 86. When conducting a factual sufficiency review, we

consider "whether a verdict that is supported by legally sufficient evidence nevertheless reflects a risk of injustice that would compel ordering a new trial." *Rogers*, 2018 WL 360047, at *5 (quoting *Dever*, 521 S.W.3d at 86); *see also In re Commitment of Harris*, No. 14-16-00706-CV, 2017 WL 6003623, at *3 (Tex. App.—Houston [14th Dist.] Dec. 5, 2017, no pet. h.). We view all the evidence in a neutral light to determine whether a jury was rationally justified in finding the defendant is an SVP beyond a reasonable doubt. *Williams*, 2017 WL 5892389, at *5. We will reverse only if, after weighing the evidence, we determine the risk of an injustice remains too great to allow the verdict to stand. *Id.*; *see also In re Commitment of Day*, 342 S.W.3d 193, 213 (Tex. App.—Beaumont 2011, pet. denied).

The jury is the sole judge of credibility of the witnesses and the weight to be given to their testimony. *Harris*, 2017 WL 6003623, at *3; *Williams*, 2017 WL 5892389, at *5. It is the role of the jury to resolve conflicts and contradictions in the evidence "by believing all, part, or none of the witnesses' testimony," *In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.—Beaumont 2002, pet. denied), and we may not substitute our judgment for that of jury. *In re Commitment of Riojas*, No. 04-17-00082-CV, 2017 WL 4938818, at *4 (Tex. App.—San Antonio Nov. 1, 2017, no pet.) (mem. op.); *Williams*, 2017 WL 5892389, at *5.

*Analysis*

Brown contends the evidence is legally and factually insufficient to support the jury's finding he has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Brown specifically argues (1) the term "likely" in the definition of SVP in the Act should be construed as meaning "more likely than not"; (2) Dr. Thorne did not diagnose Brown with a "condition" defined in the DSM, and the V Codes assigned to Brown by Dr. Thorne do not satisfy the "condition" part of the statutory definition of "behavioral abnormality"; and (3) Brown's testimony at trial did not reliably establish he engaged in the 1988 unadjudicated offense.

As to Brown's first argument, the Act does not define "likely."[6]  However, use of the term "likely" in the Act does not require evidence of a specific percentage of risk, and the term should not be interpreted to mean "more likely than not."  *Riojas*, 2017 WL 4938818, at *4; *In re Commitment of Terry*, No. 09-15-00500-CV, 2016 WL 7323299, at *13 (Tex. App.—Beaumont Dec. 15, 2016, no pet.) (mem. op.) (expert's working definition of "likely" as "more than a mere possibility" does not render evidence in an SVP civil commitment case legally or factually insufficient) (citing *In re Commitment of Muzzy*, No. 09-13-00496-CV, 2014 WL 1778254, at *2 (Tex. App.—Beaumont May 1, 2014, pet. denied) (mem. op.)).  Rather, the jury, as the factfinder, is charged with the responsibility of determining whether the defendant is an SVP, including whether he is likely to engage in repeated predatory acts of sexual violence.  *See Riojas*, 2017 WL 4938818, at *4 (expert's definition of the term "likely" as used in the Act goes to the weight the jury decides to give the expert's testimony); *Terry*, 2016 WL 7323299, at *13; *Muzzy*, 2014 WL 1778254, at *2.[7]

We next turn to Brown's complaint that Dr. Thorne failed to support his opinion Brown is sexually deviant "with some type of DSM sexual-disorder (or 'paraphilia') mental diagnosis," and the V Codes assigned to Brown by Dr. Thorne simply have "little, if any, significance in an evidentiary-sufficiency review."  Brown acknowledges that a sexual-disorder diagnosis is not required for a finding of a behavioral abnormality, but asserts the lack of a diagnosis is an important factor in considering the sufficiency of the evidence.

The Act is silent as to both mental diagnoses and the DSM.  *Dever*, 521 S.W.3d at 87; *see also In re Commitment of Gomez*, No. 13-16-00614-CV, 2017 WL 6379784, at * (Tex. App.—

---

[6] The Texas Supreme Court, in considering the statutory language of "likely to engage in a predatory act of sexual violence" and "predisposes the person to commit a sexually violent offense," stated "the import of predisposition and likelihood is exactly the same increased risk."  *In re Commitment of Bohannan*, 388 S.W.3d 296, 303 (Tex. 2012); *see also* TEX. HEALTH & SAFETY CODE ANN. §§ 841.002(2), 841.003(a)(2).  "An increased likelihood of misconduct indicates a predisposition, and a predisposition threatens increased likelihood."  *Id.*

[7] In this case, Dr. Thorne testified he defined "likely" as probable, but had not assigned a percentage to that "probability."  Dr. Mauro defined the term "likely" to be "synonymous with probable."

Corpus Christi Dec. 14, 2017, no pet. h.); ("[T]here is no statutory requirement of a mental health diagnosis to civilly commit a person as an SVP, chapter 841 reveals no requirement of a diagnosis."). Further, the Texas Supreme Court has declined to impose a requirement that the defendant be diagnosed with a condition recognized by the DSM, concluding, "A medical diagnosis of a person's mental health may certainly inform an assessment of whether he has an SVP's behavioral abnormality, but the principal issue in a commitment proceeding is not a person's mental health but whether he is predisposed to sexually violent conduct." *In re Commitment of Bohannan*, 388 S.W.3d 296, 306 (Tex. 2012). Accordingly, Dr. Thorne's failure to diagnosis Brown with a mental disorder recognized in the DSM is merely one piece of evidence the jury had to consider in determining whether Brown suffers from a behavioral abnormality. *See Gomez*, 2017 WL 6379784, at *6–7 (concluding expert's reliance on a V code condition without making DSM recognized diagnosis did not cause evidence to be legally insufficient to support jury's finding that defendant had a behavioral abnormality); *Dever*, 521 S.W.3d at 87; *Mares*, 521 S.W.3d at 73 (expert's opinion that defendant suffered "from unspecified paraphilia with features of sadism and anti-social personality disorder" constituted probative evidence defendant had a behavioral abnormality, and it was jury's role to evaluate the expert's credibility).

Brown finally asserts his "equivocal admissions" at trial that he committed a sexual offense against a three-year-old boy in 1988 cannot support a finding that he committed the unadjudicated offense, particularly given his low intellectual functioning and his previous denials of the conduct. Brown admitted at trial that he pulled the boy's penis so hard it left abrasions, and he probably affected the child "very bad." He also testified he had two victims "so far," and he had previously stated incorrectly that he had four victims. The jury also heard evidence Brown had previously denied assaulting the boy, and was not charged criminally with the offense. Dr. Mauro testified that, in her opinion, the fact Brown was not charged with a criminal offense was the most reliable

–18–

indication of whether the conduct occurred. It was, again, the role of the jury to weigh this evidence and determine its credibility. *See Harris*, 2017 WL 6003623, at *3; *Williams*, 2017 WL 5892389, at *5.

The jury heard evidence about Brown's sexual offenses, risk factors for reoffending, possible mitigating factors, educational classes he completed in prison, substance abuse, and criminal history. Dr. Thorne and Dr. Mauro described for the jury the methodology they used, and the risk factors for reoffending that they considered, in evaluating whether Brown had a behavioral abnormality under the Act. Dr. Thorne and Dr. Mauro reached different conclusions on whether Brown had a behavioral abnormality, and it was the role of the jury to resolve the conflicts in the experts' testimony. *See In re Commitment of Mosley*, No. 09-15-00420-CV, 2017 WL 930015, at *6 (Tex. App.—Beaumont Mar. 9, 2017, no pet.) (mem. op.) (as factfinder, jury was entitled to accept opinions of one expert over another); *In re Commitment of Lucero*, No. 09-14-00157-CV, 2015 WL 474604, at *7, 8 (Tex. App.—Beaumont Feb. 5, 2015, pet. denied) (mem. op.).

Viewed in a light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Brown has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Further, weighing all the evidence, we conclude there is not a risk of injustice too great to allow the verdict to stand. Accordingly, the evidence is legally and factually sufficient to support the jury's finding Brown suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. We resolve Brown's first and third issues against him.

We affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

161178F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN RE: THE COMMITMENT OF
JOHNNY DOYLE BROWN

No. 05-16-01178-CV

On Appeal from the 86th Judicial District
Court, Kaufman County, Texas,
Trial Court Cause No. 94099-86.
Opinion delivered by Justice Fillmore,
Justices Lang-Miers and Stoddart
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.


Judgment entered this 20th day of February, 2018.